**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 09-64-DLB**

**DON SCHMIDT**                                                                              **PLAINTIFF**

**vs.**                              **MEMORANDUM OPINION & ORDER**

**AMERICAN RETAIL CORPORATION**
**d/b/a WATSON'S**                                                                          **DEFENDANT**

\* \* \* \* \* \* \* \* \*

This action arose after Plaintiff Don Schmidt was discharged from his position as general manager of Defendant American Retail Corporation's (ARC) St. Louis store. Plaintiff claims he was discharged because of his age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(a)(1), the Missouri Human Rights Act, Mo. Rev. Stat. § 213.055, and Missouri public policy.[1]  Defendant responds that it discharged Plaintiff because his tenure as general manager was "just not working out," as evidenced by multiple complaints from multiple managers of the St. Louis store.  (Doc. # 26-2 at 113). The Court has jurisdiction over the ADEA claim pursuant to that Act, 29 U.S.C. § 626(c)(1), as well as 28 U.S.C. §§ 1331, 1332.  The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

---

[1]  Plaintiff conceded dismissal of his Missouri public policy claim in his Response to Defendant's Motion for Summary Judgment (Doc. # 29 at 6 n.2) and at oral argument. Consequently, this Memorandum Opinion & Order does not address Plaintiff's public policy claim.

This matter is before the Court on Defendant ARC's Motion for Summary Judgment. (Doc. # 24). Oral argument on the motion was conducted on December 2, 2010. Plaintiff Don Schmidt was represented by Tod J. Thompson and Randolph H. Freking and Defendant ARC was represented by Wijdan Jreisat. The matter has been fully briefed (Docs. # 24, 29, 43) and is ripe for review. For the reasons that follow, Defendant ARC's Motion for Summary Judgment will be **granted.**

## I.      BACKGROUND

Plaintiff was hired by Watson's of Cincinnati in 1985 as a salesperson and was promoted to sales manager two years later. In 2000, Plaintiff was named the general manager of the Louisville franchise, but was unhappy in that position, and four months later returned to the Cincinnati store. Plaintiff worked as a salesperson in Cincinnati for a little over three years before becoming the service department manager in February 2004. Defendant ARC purchased Watson's of Cincinnati on December 31, 2006 and hired Plaintiff to remain in his capacity as the service manager. At the time, Plaintiff was 54 years old.

In a late 2007 meeting, Watson's franchise owners decided to terminate the franchise agreement with the St. Louis store, which had suffered declining sales because of management troubles. At the time of that meeting, ARC planned to purchase the St. Louis store. At the same meeting, the franchise owners agreed that Erik Mueller, ARC's President and owner, would discuss with Plaintiff the possibility of managing the St. Louis store.

Mueller later explained that Plaintiff was a candidate, and ultimately the choice, for general manager because he "possessed [the] skills and qualifications" and had "years of experience" at Watson's. (Doc. # 35 at 37). Mueller also stated that he was somewhat concerned about Plaintiff's management style and temperament, which made him a less-than-ideal candidate. Ultimately, Mueller offered Plaintiff the job and after a few weeks, Plaintiff accepted. In January 2008, Plaintiff took over as general manager of the St. Louis store, reporting directly to Mueller.

One month later, Mueller and franchise owners from Louisville and Dayton visited the St. Louis store. Mueller later stated that he was "unsettled" by some observations during the visit. (Doc. # 24-1 ¶ 11). While Mueller and the other franchise owners cleaned and organized the store, Plaintiff "spent most of his time in [his] office." (Doc. # 35 at 18). Another "big irritant" was that Mueller had to instruct Plaintiff to answer the phones, which Plaintiff only did for about five minutes, before ceasing. (Doc. # 35 at 69). Mueller subsequently explained to Plaintiff, "in a mentoring kind of" way, how the store's appearance and operations should be improved. (Doc # 35 at 20).

Also during the February visit, Mueller reported to Plaintiff that a manager in the St. Louis store had complained that Plaintiff's management style was "my way or no way" and advised Plaintiff to be more low key. (Doc. # 26-1 at 88). Plaintiff disagreed with that assessment, saying, "I never had managed like that." (Doc. # 26-1 at 90).

Plaintiff and Mueller communicated several times after the February visit. During an April 2008 conversation, Plaintiff expressed his reservations about buying a house in St. Louis because sales at the store remained weak. According to Plaintiff, Mueller encouraged him to "[g]o for it" because although sales were down "your expenses are way

down too, so everything is going fine." (Doc. # 26-1 at 97-98 ). Mueller testified that he only told Plaintiff that "as long as you don't do something to get yourself in trouble with your employment . . . you should be fine." (Doc. # 35 at 128).

Mueller visited St. Louis again in April 2008 and told Plaintiff that the inside of the store looked better than it ever had, but that the outside was still dirty. During this second visit, Mueller told Plaintiff that he was still receiving complaints from St. Louis managers that Plaintiff had adopted a "my way or the highway" management style. (Doc. # 26-1 at 49). Plaintiff later recalled that he did not "know where that was coming from" because "I wasn't managing in that way." (Doc. # 26-2 at 101-02).

During the April 2008 trip, Mueller observed a management meeting during which he perceived Plaintiff to interrupt and talk down to the other managers, saying things like, "that's not the way we do it around here." (Doc. # 35 at 84). Mueller was disappointed by this meeting because he had previously instructed Plaintiff that he would have to "rally the troops" in St. Louis by being a "very positive influence on them." (Doc. # 24-1 ¶ 15).

Mueller was also upset that Plaintiff did not lead all the sales training meetings. Mueller testified that he "told Don specifically, 100 percent, I want you doing all the training meetings, because you have more expertise than these guys do." (Doc. # 35 at 117). Plaintiff initially allowed others to run the meetings in an attempt to be inclusive and counteract the resentment he sensed as an outsider who was hired at the expense of someone being promoted from within. Near the end of his employment, however, Plaintiff said that he "ran everything" and did not allow others to run sales meetings. (Doc. # 26-1 at 75). Mueller was nonetheless upset that Plaintiff "wasn't doing them all the time" because "that was surely the expectation; he knew it, I knew it." (Doc. # 35 at 30).

4

About the same time as the April 2008 trip, Mueller received reports from managers that Plaintiff "spent an inordinate amount of time—sometimes as much as half of the work day—shut in his office, often locking the door behind him when he exited the office." (Doc. # 24-1 ¶ 17). Mueller communicated these complaints to Plaintiff, who disagreed, because "I was on the floor when I was supposed to be on the floor [ ] [and] I was in my office when I needed to be in my office." (Doc. # 26-2 at 105).

St. Louis staff also complained that Plaintiff refused to assist with certain responsibilities, despite Mueller's instruction to Plaintiff to "get down, you know, in the basic work with [the employees]." (Doc. # 24-1 ¶ 15). Mueller recalled that when he asked complaining staff members for specific examples, Rick Wilson, the warehouse manager, explained that while the managers and staff worked together to prepare for the biggest sales event of the year, Plaintiff remained in his office most of the day. (Docs. # 24-1 ¶ 18; 38 at 3). When Plaintiff emerged from his office, he was unwilling to get sodas for the other employees, explaining that a store manager in Cincinnati would not do that. Wilson's testimony contradicts Mueller's account. Wilson testified that he "did not speak on anybody's behalf about anything" to Mueller, but did inform Mueller that morale was low and that he should visit and talk to the managers individually about their specific complaints. (Doc. # 38 at 26).

Mueller also identified complaints from Rob Caudillo, a sales manager, and Sheila Leonard, the service manager, as leading to Plaintiff's discharge. Mueller recounted an array of complaints from Cuadillo, including Plaintiff's failure to lead by example, to be a team player, and accusations that he created a negative sales staff culture. Mueller also fielded complaints from Leonard that Plaintiff was demeaning and condescending to her

and other employees and had held up a toddler's-size company tee-shirt and said that he wanted to see her in it. Though Plaintiff denied making such a comment, he testified that Mueller told him that Leonard had complained about the incident.

Leonard eventually told Mueller that she could not work for Plaintiff. She was not the only manager to express reservations about remaining at the St. Louis store if Plaintiff remained its general manager. Gene Darter, a sales manager, was so dissatisfied with Plaintiff's management that he "began to explore other employment opportunities." (Doc. # 24-3 ¶ 7). Mueller stated in his affidavit that by the late summer and early fall of 2008 he believed that keeping Plaintiff could lead to him "los[ing] key managers (and possibly the store itself)." (Doc. # 24-1 ¶ 29).

By July 2008, the complaints had built up to the point that Mueller believed that there was a "major issue, and firing [Plaintiff] was one of the options." (Doc. # 35 at 126). Mueller conceded that he did not communicate to Plaintiff the possibility that he would be terminated, instead believing that his previous admonitions were sufficient warning. By late July or early August 2008, Mueller had decided to terminate Plaintiff, but did not tell him because he wanted to be sure that the store was in a "healthy position" and the "right person" was in place to make such a significant transition. (Doc. # 35 at 139). Mueller also held out hope that Plaintiff would change his management style and that the St. Louis managers would report this change, foreclosing the need to terminate Plaintiff. Unfortunately for Plaintiff, this did not happen. Mueller traveled to St. Louis and terminated Plaintiff on October 22, 2008, telling him that "it's just not working out." (Doc. # 26-2 at 113). When Plaintiff said he did not understand why he was being discharged, Mueller, according to Plaintiff, explained that there had been complaints about his management,

somebody at the St. Louis store was ready to quit, and Leonard had approached Mueller with an allegation of sexual harassment.

## II.    ANALYSIS

### A.    Summary Judgment Standard

"The court shall grant summary judgment if the [Defendant] shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).[2]  The court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the non-moving party."  *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 361 (6th Cir. 2001).

Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), it must produce evidence showing that a genuine issue remains.  *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000).  The moving party will satisfy its burden if it can establish that "there is no evidence underlying the non-moving party's case."  *Univ. of Pittsburgh v. Townsend*, 542 F.3d 513, 522 (6th Cir. 2008).  If, after reviewing the record as a whole, a rational factfinder could not find for the nonmoving party, summary judgement should be granted.  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

### B.    ADEA Claim

#### 1.    Burden-Shifting Analysis

---

[2]  Amendments to Fed.R.Civ.P. 56 took effect December 1, 2010.  The advisory notes accompanying the 2010 Amendments make clear that "[t]he standard for granting summary judgment remains unchanged."

The ADEA prohibits an employer from discharging an employee "because of such individual's age." 29 U.S.C. § 623(a)(1). "The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000).

An ADEA violation can be proved by either direct or circumstantial evidence. *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008). "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc) (internal quotations omitted). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Id.* Whether by direct or circumstantial evidence, however, in any disparate treatment action, an ADEA plaintiff bears the burden of persuasion to show "that age was the 'but for' cause of their employer's adverse action." *Gross v. FBL Fin. Servs., Inc.*, 129 S.Ct. 2343, 2351 n.4 (2009).

Plaintiff testified that neither Mueller nor any other of Defendant's employees said or did anything to indicate discrimination on the basis of age. (Doc. # 26-2 at 130). And Plaintiff ultimately concluded that Defendant discriminated against him on the basis of age because he disagreed with the reason Mueller gave for discharging him. (Doc. # 26-2 at 131). Because Plaintiff concedes, and the record confirms, that there is no direct evidence of age discrimination, the Court evaluates Plaintiff's claim as resting on circumstantial

evidence.

To state a prima facie case of age discrimination under the ADEA using circumstantial evidence, Plaintiff must satisfy the four elements of the *McDonnell Douglas* test by showing that he was (1) a member of a protected class; (2) discharged; (3) qualified for the position he held; and (4) replaced by someone outside the protected class. *Schoonmaker v. Spartan Graphics Leasing, LLC,* 595 F.3d 261, 264 (6th Cir. 2010) (citing *Geiger v. Tower Auto.*, 579 F.3d 614, 622-23 (6th Cir. 2009)). The Supreme Court modified the fourth element in age discrimination cases to require replacement not by a person outside the protected class, but by a significantly younger person. *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003) (citing *O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 311-13 (1996)). These elements should not be applied "mechanically" but on a "case-by-case approach that focuses on whether age was in fact a determining factor in the employment decision." *Schoonmaker*, 595 F.3d at 265 n.3 (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 n.9 (6th Cir. 1990)).

There is little dispute that Plaintiff has stated a prima facie case of age discrimination. First, Plaintiff was age 56 when he was discharged (Doc. # 26-2 at 134), well within the protected class of those age forty and over. 29 U.S.C. § 631(a); *Barnes*, 896 F.2d at 1465 (stating that the first element of a prima facie case of age discrimination is that the plaintiff "was age forty or over"). Second, Plaintiff was discharged. (Doc. # 24-1 ¶¶ 30-31). Third, Defendant conceded that "Plaintiff generally possessed the qualifications for the position." (Doc. # 35-1 at 17). Finally, Rob Caudillo was 48 years old when he replaced Plaintiff—eight years younger. (Doc. # 24-2 ¶ 1). The Sixth Circuit has held that

in the absence of direct evidence that an employer considered age to be significant, "an age difference of six years or less between an employee and a replacement is not significant," but an eight-year difference "can be" significant. *Grosjean*, 349 F.3d at 340.

Because Plaintiff has stated a prima facie case of age discrimination, the burden of production shifts to Defendant to articulate a legitimate, nondiscriminatory reason for discharging him. *Schoonmaker*, 595 F.3d at 264 (citing *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 394 (6th Cir. 2008)). This burden "is one of production, not persuasion; it involves no credibility assessment." *Felder v. Nortel Networks Corp.*, 187 Fed.Appx. 586, 592 (6th Cir. 2006) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

Mueller told Plaintiff that he was terminated because "it's just not working out." (Doc. # 26-2 at 113). According to Plaintiff, when asked why it was not working out, Mueller said he had received complaints about Plaintiff's management, had learned that one or more of the St. Louis managers was getting ready to quit, and Sheila Leonard had approached him with an allegation of sexual harassment. (Doc. # 26-2 at 114, 116). Notably, Mueller's decision was not based on just one of these reports, or even their veracity, but on his conclusion that because of the complaints and negative reports from the St. Louis managers, Plaintiff's tenure as general manager was not working out.

This is consistent with Defendant's position since this litigation commenced. In his affidavit, Mueller explains that it was not a single incident that led to Plaintiff's discharge; rather, it was concerns or complaints from "[v]irtually every management level employee" that "provided an overall picture of a manager who was not managing well and whose team was not behind him." (Doc. # 24-1 ¶ 24). Discovery uncovered specific incidents and

behaviors that Mueller either observed or received complaints about. (Doc. # 24 at 19-20). These are not the proffered reasons for discharge. Rather, these particulars add up to Defendant's reason for terminating Plaintiff: That Plaintiff's tenure as general manager was not working out, as indicated by Mueller's receipt of negative reports and complaints from several St. Louis managers. This is more than sufficient to satisfy Defendant's burden.

### 2. Pretext

Because Defendant has provided a legitimate, nondiscriminatory reason for discharging Plaintiff, the burden of production shifts back to Plaintiff to demonstrate that Defendant's explanation was a pretext for intentional age discrimination. *Schoonmaker*, 595 F.3d at 264 (citing *Allen*, 545 F.3d at 394). "To carry [his] burden in opposing summary judgment, [Plaintiff] must produce sufficient evidence from which a jury could reasonably reject [Defendant's] explanation of why it fired [him]." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009) (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 526 (6th Cir. 2008)). Plaintiff does not necessarily need additional evidence to meet his burden because "[i]n some cases, plaintiff's evidence establishing the prima facie case can also be sufficient to meet one or more of the elements necessary to rebut the defendant's proffered non-discriminatory reasons." *Grosjean*, 349 F.3d at 335.

Plaintiff can disprove Defendant's reason by showing that it "(1) ha[s] no basis in fact, (2) [is] not the actual reason[ ], or (3) [is] insufficient to explain [Defendant's] actions." *Felder*, 187 Fed.Appx. at 592 (citing *Logan v. Denny's Inc.,* 259 F.3d 558, 567 (6th Cir. 2001)). Plaintiff takes the first two approaches by arguing that Defendant's asserted reason for discharging him has no basis in fact or did not motivate the actual decision.

(Doc. # 29 at 13-23). To show that Defendant's reason has no basis in fact, Plaintiff must have "evidence that the proffered bas[is] for [his] discharge never happened." *Mischer v. Erie Metro Hous. Auth.*, 168 Fed.Appx. 709, 715 (6th Cir. 2006) (quoting *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (*overruled on other grounds by Geiger*, 579 F.3d at 621). The second approach, showing Defendant's proffered reason for discharge was not the actual reason, is more difficult because Plaintiff "admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal." *Id.* (emphasis in original). Instead of disputing the facts, the "plaintiff attempts to indict the credibility of his employer's explanation" and show "that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup" for age discrimination. *Id.*

The Sixth Circuit recently admonished courts to "avoid formalism" in pretext analyses "lest one lose the forest for the trees." *Chen*, 580 F.3d at 400 n.4. Rather, pretext is a "common sense inquiry" that asks if "the employer fire[d] the employee for the stated reason or not" by considering "whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is." *Id.* Finally, Plaintiff cannot prove pretext by showing that Defendant's "rationale was 'mistaken, foolish, trivial, or baseless,' so long as [Defendant] honestly believed in the rationale and based this belief on particularized facts before it at the time." *Felder*, 187 Fed.Appx. at 592 (quoting and citing *Smith v. Chrysler Corp.,* 155 F.3d 799, 806-07 (6th Cir. 1998)).

Plaintiff takes three approaches to attacking Defendant's proffered reason for discharging him. First, Plaintiff contends that the St. Louis managers' complaints had no basis in fact or did not motivate Defendant's decision to discharge him. Second, Plaintiff contends that Mueller's accounts of what he observed had no basis in fact or did not motivate Defendant's decision to discharge him. Finally, Plaintiff avers that declining sales did not motivate Defendant's decision to discharge him.

Plaintiff first highlights inconsistencies between Mueller's recollection of complaints from the St. Louis managers, and the managers' recollections of those same complaints, to argue that Defendant's proffered reason for discharging him has no basis in fact. (Doc. # 29 at 15). Plaintiff also contends that Defendant's reason for discharging him is inconsistent, and consequently, either has no basis in fact or did not motivate his discharge. Specifically, Plaintiff observes that he was accused of being both overbearing as well as spending too much time in his office and delegating leadership of sales training meetings. (Doc. # 29 at 10). Plaintiff argues that these are contradictory accusations.

These arguments are unavailing because they mischaracterize Defendant's reason for discharging him, which was that a steady stream of complaints from St. Louis managers describing Plaintiff as an ineffective manager led Mueller to conclude that Plaintiff's tenure as general manager was not working out. Thus, the Court considers whether *this* reason has no basis in fact or did not motivate Plaintiff's discharge.

In considering whether Defendant's reason for discharging Plaintiff had a factual basis and actually motivated its decision, the Court looks not to whether witnesses recounted details identically, but whether Mueller observed and heard that Plaintiff was not

successfully managing the St. Louis store. This is not to suggest that the Court will ignore "weaknesses, implausibilities, inconsistencies, incoherence, or contradictions" in Defendant's proffered reason for discharging Plaintiff; it will not, because these may suggest Defendant's reason for discharge is pretextual. *Boze v. Gen. Elec. Co.*, No. 4:07-cv-74, 2009 WL 2485394, at *9 (W.D.Ky. Aug. 11, 2009) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994)). Rather, it is to affirm that the search for such weaknesses must focus on Defendant's actual reason for discharge.

There is no dispute about the material fact that Mueller received negative reports or complaints from each of the managers in St. Louis. Mueller stated that he received such complaints. (Docs. # 24-1 ¶ 18, 20, 24; 35 at 100-01, 108, 121-22). Three managers of the St. Louis store, Rob Caudillo (Doc. # 24-2 ¶¶ 4-5), Gene Darter (Doc. # 24-3 ¶¶ 4-5), and Sheila Leonard (Doc. # 24-4 ¶¶ 3, 5), stated in affidavits that they each complained to Mueller about Plaintiff *at least* once. The fourth manager, Rick Wilson testified that he called Mueller, told him morale was low, and advised Mueller to visit so he could "talk to each manager individually and find out the issues that they were having with [Plaintiff]." (Doc. # 38 at 25). Joe Hildebrandt, Defendant's Controller, testified that Mueller told him that he was receiving complaints from the St. Louis managers about Plaintiff's performance as store manager. (Doc. # 33 at 17).

Mueller confirmed that it was not the specifics or the merits of complaints, but their frequency and persistence, that concerned him. Mueller testified that he was initially skeptical of the complaints, saying "obviously I'm defending Don[ ] [because] . . . I put him out there . . . . I just don't buy this." (Doc. # 35 at 101). Mueller stated that his experience

had taught him that "if you have an isolated complaint or witness an isolated incident, that is not cause for alarm." (Doc. # 24-1 ¶ 23). Put differently: "You hear something once, its once. You see something once, its once. On the other hand, when you hear the same issue again, your ears perk up a little bit. When you start to hear it a third time, and a fourth time, and a fifth time, and a sixth time, it's an issue." (Doc. # 24-1 ¶ 23). Ultimately, Mueller discharged Plaintiff not because of a single incident, but because of the cumulative weight of the complaints and negative reports: "After weighing all these issues, I decided to terminate Mr. Schmidt's employment." (Doc. # 24-1 ¶ 30).

Plaintiff, nonetheless, continues to dispute the merits of the specific complaints lodged against him. But, as discussed *supra*, the material issue is not the merits of the complaints, but their existence, frequency, and persistence. And on this issue, there is no genuine, factual dispute. In fact, Plaintiff confirmed that Mueller told him that he was receiving complaints from the managers in St. Louis. (Docs. # 26-1 at 87-89, 99-100; 26-2 at 103-05). Rather than question *whether* Mueller actually received the complaints, Plaintiff argued that the complaints were unfounded. (Docs. # 26-1 at 88, 90-91, 99; 26-2 at 101-05). Indeed, at one point during Plaintiff's deposition, defense counsel asked him whether "you believe [Mueller] when he tells you that he was receiving complaints." (Doc. # 26-2 at 105). Plaintiff answered, "Sure." (Doc. # 26-2 at 105). Later during his deposition, Plaintiff said that he was unsure whether he believed that Mueller actually received any complaints from the St. Louis managers. (Doc. # 26-2 at 124).

The Sixth Circuit rejected an argument similar to Plaintiff's in *Mischer* by carefully defining the defendant's reason for discharging the plaintiff. There, a manager who set out

to clean up "30 years of issues" at a government agency, was terminated within two months of her promotion because she was confrontational and unable to "work compatibly or professionally with others." *Mischer*, 168 Fed.Appx. at 711, 713, 716. The plaintiff argued that the decisions she made that resulted in the confrontations, and the positions she took in those confrontations, were correct. *Id.* at 716. The district court and Sixth Circuit concluded that in arguing about the merits of the confrontations, plaintiff "miss[ed] the point" and failed to raise a genuine dispute about the principal reason given for her termination—"that she simply could not work amicably with other people." *Id.*

Likewise, Plaintiff in this case was expected to "begin to stabilize and turnaround the [St. Louis] store's economic performance, which had been declining under previous management." (Doc. # 24-1 ¶ 9). Like the plaintiff in *Mischer*, Plaintiff acknowledges the essential facts leading to his discharge—that the St. Louis managers complained to Mueller that Plaintiff was an ineffective manager. And as in *Mischer*, Plaintiff contests the merits of the complaints, arguing that there was nothing "[I] could do to improve the situation because I wasn't the one that had the problem." (Doc. # 26-2 at 102). As in *Mischer*, Plaintiff has failed to raise a genuine dispute about the reason he was discharged.

While this conclusion is sufficient to show that Defendant's proffered reason was not pretextual, for the sake of thoroughness, the Court will consider the specific factual inconsistencies that Plaintiff contends create a genuine and material factual dispute.

Plaintiff identifies and emphasizes factual disputes between Mueller's and the St. Louis managers' testimony and affidavits describing the complaints lodged against him. These inconsistencies are immaterial because they relate merely to who made which

complaints at what time. In so doing, Plaintiff fails to raise a dispute about—and, in fact, confirms—the material fact that Mueller received complaints from the St. Louis managers about his performance.

For example, Plaintiff emphasizes discrepancies between Mueller's and Caudillo's accounts about who initiated a phone call in which Caudillo complained to Mueller about Plaintiff. Mueller testified that Caudillo called him after his April 2008 trip to St. Louis and complained about Plaintiff's "feeling, style of management, negative attitude, being a team player. The way that the training was done." (Doc. # 35 at 107). Caudillo testified, by contrast, that Mueller called him, indicated he had received complaints from other employees, and requested feedback on Plaintiff. (Doc. # 31 at 31-32). Who called who is not material. Caudillo said that he told Mueller that Plaintiff spent a great deal of time in his office with the door locked, spent very little time on the floor and with the staff, and did not lead the sales training meetings. (Doc. # 31 at 31-35). Consistent in both accounts is that Caudillo told Mueller that Plaintiff was failing as a leader and provoking complaints from various managers.

Plaintiff also focuses on inconsistencies between Wilson's and Mueller's accounts of their conversation. (Doc. # 29 at 19). According to Mueller, Wilson told him that while the staff prepared for the largest sale of the year, Plaintiff stayed in his office, and when he emerged, declined to get sodas for the parched employees. (Doc. # 24-1 ¶ 18). Wilson, by contrast, testified that he called Mueller, told him morale was low, and advised him to visit St. Louis so he could "talk to each manager individually and find out the issues that they were having with [Plaintiff]." (Doc. # 38 at 25). Though the accounts describe different

events, consistent in both is the material fact that Wilson complained to Mueller about Plaintiff.  In light of other undisputed evidence, this factual inconsistency does not raise a genuine dispute about the material fact that the four St. Louis managers complained to Mueller about Plaintiff.

Plaintiff also dwells on disputed aspects of Sheila Leonard's testimony.  (Doc. # 29 at 20).  Plaintiff denies Leonard's claim that he said, referring to a toddler-sized tee shirt, "I'd like to see you try that on."  (Doc. # 26-2 at 120).  Plaintiff also emphasizes that Mueller did not conduct an investigation, as required by Defendant's policy, following Leonard's allegation of harassment.  (Docs. # 29 at 21; 35-1 at 1).  Finally, Plaintiff argues that Leonard claims Caudillo and Darter told her that they believed Plaintiff was rude and demeaning, but that each offered contradictory testimony in their depositions.

Both Mueller and Leonard, however, confirm not only that Leonard complained to Mueller about Plaintiff, but also the content of Leonard's complaints.  Leonard reported to Mueller that Plaintiff was "frequently rude, condescending and demeaning to me and to other employees" and would interrupt people.  (Doc. # 24-4 ¶ 3).  Mueller characterized Leonard's complaints to him in nearly identical terms.  (Doc. # 24-1 ¶ 20).  Leonard also testified that she told Mueller that Plaintiff made comments about her physical appearance, "such as holding up a child's size company tee-shirt and saying he would like to see me in it."  (Doc. # 24-4 ¶ 4).  Though Plaintiff disputes this allegation, Mueller confirmed that Leonard lodged such a complaint with him.  (Doc. # 24-1 ¶ 21).  Finally, both Leonard and Mueller stated that Leonard ultimately told Mueller she could not work for Plaintiff.  (Docs. # 24-1 ¶ 22; 24-4 ¶ 5).

Moreover, Mueller's personal knowledge and observations of Plaintiff were consistent with many of the complaints lodged by the managers. For example, during a February 2008 visit to St. Louis, Mueller saw that the store was dirty and disorganized and that Plaintiff did not answer phones or help Mueller and the other franchise owners clean, but remained in his office. (Docs. # 24-1 ¶ 11; 35 at 67-70). During the April 2008 visit, Mueller observed Plaintiff's poor attitude and belittling approach in a manager's meeting. (Doc. # 24-1 ¶¶ 13-14). These observations were also consistent with concerns Mueller had, even before hiring Plaintiff, about his management style and temperament. (Docs. # 24-1 ¶ 5; 35 at 37, 40-41). Mueller testified that he eventually came to take the complaints from St. Louis managers particularly seriously because despite seeing "many of [Plaintiff's] problem behaviors with my own eyes," Plaintiff continued to deny "any problem on his part." (Doc. # 24-1 ¶¶ 18, 20, 24, 27).

Lastly, Plaintiff contends that the St. Louis store's sales performance did not motivate Defendant's decision to discharge Plaintiff. While it is true that sales were down in 2008 from the previous year (Docs. # 35 at 59-60; 26-1 at 79-80), Defendant did not tell Plaintiff that this decline was the reason he was being discharged. Mueller later conceded that the decline in sales "was a piece that was in my mind" but expressly concluded that it was not the reason he discharged Plaintiff. (Doc. # 35 at 59-60).

More importantly, even if Defendant had relied on declining sales as the reason it discharged Plaintiff, to show that this did not actually motivate Defendant, Plaintiff would need to offer evidence showing that it is "more likely than not" that the proffered reason of declining sales was a pretext for age discrimination. *Mischer*, 168 Fed.Appx. at 715.

Plaintiff argues he met this burden because (1) Defendant did not present actual evidence of sales figures under Plaintiff's management; (2) Plaintiff did not always receive monthly budget reports; and (3) Defendant did not provide evidence proving his assertion that sales stabilized under Plaintiff's replacement. (Doc. # 29 at 26). These are merely arguments—not evidence—and do not suggest that age discrimination was "more likely" the reason for discharge than declining sales, as required by the Sixth Circuit. *Mischer*, 168 Fed.Appx. at 715.

### 3.  Same-Actor Inference

In *Buhrmaster v. Overnite Transp. Co.,* 61 F.3d 461, 463 (6th Cir. 1995), a case similar to this one, the Sixth Circuit recognized the "same-actor" inference, "which allows one to infer a lack of discrimination from the fact that the same individual both hired and fired the employee." There, the plaintiff was promoted to office manager, where she served as the terminal manager's "right hand man" and supervised personnel. *Id.* at 462. After employees complained to the terminal manager, he discharged plaintiff and offered a rationale similar to Defendant's in this case:

> The fact that she had been unable to maintain the morale and provide the leadership to the office personnel, the fact that if she had been able to provide the leadership to the personnel, they wouldn't have been coming to me individually and en masse to complain about the way they felt about her as an office manager, and that the feelings were so strong that the office staff was in near revolt at the time and the only way to get the terminal operation at the administrative end of it back on an even keel was to remove her from the position as the office manager.

*Id.* In upholding an instruction permitting the jury to draw the same-actor inference, the *Buhrmaster* court quoted the Fourth Circuit's rationale from *Proud v. Stone*, 945 F.2d 796,

797 (4th Cir. 1991): "One is quickly drawn to the realization that 'claims that employer animus exists in termination but not in hiring seem irrational.' From the standpoint of the putative discriminator, 'it hardly makes sense to hire workers from a group one dislikes . . . only to fire them once they are on the job.'" 61 F.3d at 463. This rationale is particularly applicable in this case because Plaintiff expressly stated that he did not believe age was a factor in Mueller's decision to offer him the general manager position. (Doc. # 26-2 at 126).

Both parties rely on *Wexler v. White's Fine Furniture* to dispute whether the Court may consider the same-actor inference at the summary judgment stage. In *Wexler*, the Sixth Circuit revisited *Buhrmaster*, emphasizing that the plaintiff there provided no direct evidence of defendant's discriminatory intent and that the circumstantial evidence against the defendant was weak. 317 F.3d at 572. The same is true of this case. The Sixth Circuit then identified three approaches to the same-actor inference taken by its sister circuits, with one end of the spectrum finding the inference "quite persuasive" and the other "minimiz[ing] the importance of the same-actor inference." *Id.* at 573. In adopting the latter approach, the Sixth Circuit permitted a factfinder to draw the same-actor inference but held that it alone is insufficient to warrant summary judgment for a defendant if there is otherwise a genuine dispute of material fact. *Id.*

A few years later, in *Mischer*, the Sixth Circuit affirmed that the same-actor inference is "helpful" and "appropriate" where, as here, the case is at the summary judgment stage and Plaintiff "has presented no direct evidence of discrimination, [and] we are left to rely entirely on circumstantial evidence to resolve the question [of] whether [Defendant's]

proffered reasons for terminating [Plaintiff] might arguably be pretextual." 168 Fed.Appx. at 717 n.4. As detailed in Part II(B)(2), *supra*, this case's facts and procedural posture are similar to *Mischer*'s and there is otherwise no genuine dispute of material fact. Consequently, the same-actor inference is helpful and appropriate here.

Defendant ARC, acting through its President, Erik Mueller, both hired and fired Plaintiff.[3] Plaintiff was 54 years old when Mueller hired him to be the service manager of Watson's of Cincinnati, after ARC purchased the store on December 31, 2006. (Docs. # 24-1 ¶ 3; 26 at 29-30). A little less than a year later, when Plaintiff was 55 years old, Mueller hired him to be the general manager of the St. Louis store. (Docs. # 24-1 ¶¶ 5-6; 26-2 at 134). Plaintiff later testified that he did not believe that age was a factor in Mueller's decision to hire him as general manager. (Doc. # 26-2 at 126). Approximately nine months after hiring Plaintiff, Mueller discharged him because it was not working out. (Doc. # 24-1 ¶ 31). At the time, Plaintiff was 56 years old. (Doc. # 26-2 at 134). Thus, as it is permitted to do, the Court "infer[s] a lack of discrimination from the fact that the same individual both hired and fired" Plaintiff in a period of less than a year. *Buhrmaster*, 61 F.3d at 463. This

---

[3] Plaintiff argues that "a jury could conclude instead that Mueller was only part of a group of management and franchise owners who decided before ARC bought the St. Louis store to terminate Boeres and promote Schmidt." (Doc. # 29 at 21). The facts belie this argument. Whatever decisions were reached in the franchise owners meeting preceding Boeres' termination, the fact remains that ARC bought the St. Louis store and only ARC had the authority to hire employees to work there. Erik Mueller, the President and owner of ARC, offered Plaintiff the position of general manager, was Plaintiff's supervisor, and discharged Plaintiff. (Docs. # 24-1 ¶¶ 5-6, 30-31; 35 at 60). Even if Plaintiff introduced evidence showing he was offered the general manager position before ARC finalized the purchase (and consequently Mueller did not have absolute authority to hire Plaintiff at that time) Mueller would have had to reaffirm Plaintiff's hire when the acquisition was complete and he had complete authority over the St. Louis store.

inference is additional, though not dispositive, evidence that Defendant's reason for discharge is not pretextual.

### 4.    ADEA Conclusion

After Plaintiff stated a prima facie case of age discrimination, Defendant provided a legitimate, nondiscriminatory reason for discharging him, namely that Plaintiff's tenure as general manager of the St. Louis store was "not working out," as evidenced by complaints from several managers.  The burden of production then shifted to Plaintiff to show that Defendant's proffered reason for discharge was a pretext for age discrimination.  Plaintiff failed to meet this burden.  He vigorously challenged the merits of the complaints, emphasizing immaterial factual inconsistencies in an attempt to discredit the substance of the complaints.  But these challenges miss the point—that the record is replete with uncontested evidence establishing that Mueller received complaints from St. Louis managers, leading him to conclude that Plaintiff was "not working out" as general manager. Because Plaintiff failed to raise a genuine dispute that Defendant's proffered reason for discharge was a pretext for age discrimination, Defendant's Motion for Summary Judgment of Plaintiff's ADEA claim will be **granted**.

### C.    Missouri Human Rights Act Claim

The Missouri Human Rights Act (MHRA) makes it an unlawful employment practice for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . age."  Mo. Rev. Stat. § 213.055(1)(a).  The Missouri Supreme Court recently compared the MHRA to federal employment discrimination laws

and instructed courts to be "guided by both Missouri law and federal employment discrimination caselaw that is consistent with Missouri law." *Daugherty v. City of Md. Heights*, 231 S.W.3d 814, 818 (Mo. 2007). While similar, the MHRA's discrimination safeguards "are not identical to the federal standards and can offer greater discrimination protection." *Id.* at 819. Consequently, where the "wording in the MHRA is clear and unambiguous, then federal caselaw which is contrary to the plain meaning of the MHRA is not binding." *Id.* (quoting *Brady v. Curators of Univ. of Mo.*, 213 S.W.3d 101, 113 (Mo.App. 2006)).

The Missouri Supreme Court has concluded that the section of the MHRA at issue in this case, Mo. Rev. Stat. § 213.055, which prohibits employment discrimination based on age, is more protective than the federal equivalent. The Court reasoned that the MHRA defines "discrimination" to include "*any* unfair treatment based on . . . age as it relates to employment." *Daugherty*, 231 S.W.3d at 819 (emphasis in the original) (quoting Mo. Rev. Stat. § 213.010(5)). Consequently, to succeed under the MHRA, a plaintiff need only show that age was a contributing factor—not the but-for cause—in an unfair employment action. *Id.* "If consideration of age . . . contributed to the unfair treatment, that is sufficient." *Id.*

This distinction led the Missouri Supreme Court to replace the *McDonnell Douglas* burden-shifting analysis with a test composed of the three elements of Missouri's approved pattern jury instructions, MAI 31.24, "because a plaintiff has no higher standard to survive summary judgment than is required to submit a claim to a jury." *Id.* at 820. Thus, Plaintiff will survive summary judgment if he shows a genuine dispute of material fact that (1) Defendant discharged him; (2) age was a contributing factor in Plaintiff's discharge; and (3)

as a direct result of such conduct, Plaintiff sustained damage. *Id.* at 820 (citing MAI 31.24); *see also Korando v. Mallinckrodt, Inc.*, 239 S.W.3d 647, 649 (Mo.App. 2007) (citing *Daugherty* for the proposition that "the Missouri Supreme Court recently determined that the *McDonnell Douglas* burden shifting analysis no longer applies" and "the proper analysis for summary judgment cases under the MHRA applies the MAI 31.24 'contributing factor' standard"); *Notorangelo v. Fed. Express Corp.*, No. 4:07-cv-570, 2008 WL 4539279, at *5 (E.D.Mo. Oct. 7, 2008) (listing the three elements of MAI 31.24 as the appropriate standard for summary judgment in a claim of employment discrimination under the MHRA). "A 'contributing' factor has been defined as one 'that contributed a share in anything or has a part in producing the effect.'" *Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 867 (Mo.App. 2009) (quoting *McBryde v. Ritenour Sch. Dist.,* 207 S.W.3d 162, 170 (Mo.App. 2006)).

In applying this less demanding standard, the Missouri Supreme Court cautioned that "[s]ummary judgment should seldom be used in employment discrimination cases, because such cases are inherently fact-based and often depend on inferences rather than on direct evidence." *Daugherty*, 231 S.W.3d at 818. This word of caution, however, does not mean that summary judgment is never appropriate. Indeed, for Plaintiff to survive summary judgment, the record must show "two plausible, but contradictory, accounts of the essential facts and the 'genuine issue' in the case is real, not merely argumentative, imaginary, or frivolous." *Id.* at 820. As detailed in the ADEA analysis *supra*, Plaintiff here has failed to raise a question of fact about the stream of complaints Mueller received, which, when confirmed by his personal observations, demonstrated that Plaintiff was not

working out as the St. Louis store's general manager.  Consequently, Plaintiff has failed provide a plausible, contradictory account of the essential facts.

Missouri caselaw provides examples of evidence that has been found sufficient for a plaintiff to survive summary judgment under the "contributing factor" standard.  Plaintiff here does not meet the standard set by this caselaw.  In *Daugherty*, for example, the plaintiff offered a tape recording of his supervisor telling him that the city administrator was trying to get rid employees of over the age of 55.  231 S.W.3d at 820.  Plaintiff here has conceded that he has no such direct evidence.  (Doc. # 26-2 at 130-31).  In *Korando*, the plaintiff demonstrated that when she and three similarly situated male managers questioned the appropriateness of hiring a "diversity employee," she was the only one terminated and she was the only female.  239 S.W.3d at 650.  Similarly, the plaintiff in *Marez v. Saint-Goban Containers, Inc.*, No. 4:09-cv-999, 2010 WL 3719927, at *8 (E.D.Mo. Sept. 13, 2010) survived summary judgment of her gender discrimination claim under the "contributing factor" standard by raising a question of fact regarding whether similarly situated men were treated differently than her; the plaintiff's age discrimination claim failed because she could not show that similarly situated younger persons were treated differently than her.  As concluded *supra*, Plaintiff here offers no such circumstantial evidence that age was a contributing factor—or any factor at all—in his discharge.

Rather, this case is like *Notorangelo* where the defendant was granted summary judgment under the MHRA because the plaintiff offered no evidence that age was a contributing factor in her discharge, but instead litigated the merits of the incident leading to her discharge by attacking her coworkers' accounts, criticizing her employer's business

decisions, and objecting to her employer's characterization of the incident as "serious." 2008 WL 4539279, at *7. Similarly, Plaintiff here tries to raise factual disputes about the incidents leading to his discharge, attacks the St. Louis managers' analyses of his management abilities, and criticizes Mueller's decision to act on the St. Louis managers' complaints. The court in *Notorangelo* concluded that "[p]laintiff's focus on debating whether the disciplinary action she received was warranted by the nature of the alleged misconduct does not give rise to an inference of discrimination." 2008 WL 4539279, at *7. Here, too, Plaintiff's focus on the merits of the St. Louis managers' complaints does not raise an inference of discrimination and, consequently, does not establish a genuine dispute as to whether Plaintiff's age was a contributing factor in Defendant's decision to discharge him. Consequently, Defendant's Motion for Summary Judgment of Plaintiff's MHRA claim will be **granted**.

## III. CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that:

1. Defendant's Motion for Summary Judgment (Doc. # 24) is **GRANTED**;

2. Plaintiff's claims are **DISMISSED with prejudice**; and

3. This case is **STRICKEN** from the Court's active docket.

This 7th day of December, 2010.



Signed By:

*David L. Bunning*  DB

**United States District Judge**